IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES C. SMITH<br>(GEORGE A. SMITH, wage<br>earner)<br><br>　　　　Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 05-288 (Erie)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiff, James C. Smith, seeks judicial review of a
decision of defendant, Jo Anne B. Barnhart, Commissioner of
Social Security ("the Commissioner"), denying his applications
for childhood disability insurance benefits ("childhood DIB") and
supplemental security income ("SSI") under Titles II and XVI,
respectively, of the Social Security Act, 42 U.S.C. §§ 401-433,
1381-1383f.  Presently before the Court are the parties' cross-
motions for summary judgment pursuant to Fed.R.Civ.P. 56.  For
the reasons set forth below, plaintiff's motion for summary
judgment will be granted and the Commissioner's cross-motion for
summary judgment will be denied.

## II. Background

## A. Procedural History

On July 2, 2001, plaintiff filed an application for childhood DIB, alleging disability since June 1, 2001, based on "serious emotional disturbance."[1]   (R. 189, 198).   Plaintiff's application was denied after review by a State agency physician, and, on December 20, 2001, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").   (R. 49-54).   On January 24, 2003, plaintiff protectively filed an application for SSI, alleging disability since his 18th birthday on October 8, 2001. (R. 440).

On June 18, 2003, a hearing before an ALJ was held.   In addition to considering the denial of plaintiff's application for childhood DIB, the ALJ considered his application for SSI which had been escalated to the hearing level.   Plaintiff, who was represented by counsel, testified at the hearing.   His mother also testified.   (R. 447-86).

---

[1]In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 423(d)(1).   A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On July 21, 2003, the ALJ issued a decision denying
plaintiff's applications for childhood DIB and SSI.  (R. 35-41).
Specifically, the ALJ concluded that plaintiff retained the
residual functional capacity ("RFC") to perform the physical
requirements of work at all exertional levels,[2] and that
plaintiff's mental impairment only moderately limited his ability
to understand, remember and carry out complex tasks, to set
realistic goals and to make independent plans.  (R. 40-41,
Finding No. 7).

Plaintiff's request for review of the ALJ's decision was
granted by the Appeals Council on November 26, 2003, and the case
was remanded to the ALJ with the following instructions: (a) to
evaluate further plaintiff's mental impairment in accordance with
the special technique described in 20 C.F.R. §§ 404.1520a and
416.920a; (b) to admit into the record any evidence that was
determined to be material to the issues in the case; (c) to
consider further plaintiff's RFC and provide appropriate
rationale with specific references to evidence to support the
assessed limitations; and (d) to obtain evidence from a
vocational expert ("VE").  (R. 75-78).

A further hearing before the ALJ was held on October 20,
2004.  Plaintiff, who was represented by counsel, testified at

_____

[2]RFC is the most a disability claimant can still do despite
his or her limitations.  20 C.F.R. § 404.1545(a).

3

the hearing.  A VE also testified.  (R. 487-530).  On February

16, 2005, the ALJ issued another adverse decision.  (R. 16-24).

Specifically, in his second decision, the ALJ concluded that

plaintiff retained the RFC to perform the physical requirements

of work at all exertional levels; that plaintiff was only mildly

limited in his activities of daily living, social functioning and

concentration, persistence and pace; that plaintiff had

experienced no episodes of decompensation; that plaintiff can

occasionally interact with the public; that plaintiff can

maintain attention and concentration for extended periods; that

plaintiff can do multiple tasks if the tasks are in writing; and

that (based on the testimony of the VE) plaintiff could perform

the following jobs which exist in significant numbers in the

national economy: cleaner, cafeteria attendant and laundry

worker.  (R. 23, Finding Nos. 5 and 10).

        Plaintiff requested review of the ALJ's second decision.

(R. 12).  However, on August 4, 2005, the Appeals Council denied

the request.  (R. 9-11).  This appeal followed.

4

**B. Facts**

At the hearings before the ALJ, plaintiff testified as follows:

Plaintiff, who was 19 years old at the time of the first hearing in June 2003,[3] graduated from high school in June 2002 with an Individualized Education Program ("IEP") diploma. (R. 451, 480-81, 490). Plaintiff attended "regular mainstream classes" during his senior year, and he has no problems reading and writing. (R. 501).

Plaintiff has been taking medication for obsessive-compulsive disorder since 1994. At the time of the first hearing, plaintiff was no longer experiencing problems due to this disorder.[4] (R. 458-60, 463). In December 2001, plaintiff began experiencing depression, resulting in an inability to sleep. Plaintiff was prescribed medication for the depression, and, at the time of the first hearing, depression was not "much of a problem anymore" for plaintiff.[5] He was not in counseling. He merely saw a psychiatrist at The Guidance Center every 3 to 4

---

[3]Plaintiff's date of birth is October 8, 1983. (R. 440).

[4]During the second hearing, plaintiff testified that the medication had controlled his obsessive-compulsive behavior "quite a bit" for the past 8 to 9 years. (R. 498).

[5]During the second hearing, plaintiff testified that depression had not "been a real big problem" for a couple of years. (R. 498).

months for medication checks.  (R. 457, 463, 507).  Plaintiff
also takes three medications for hypertension and an antibiotic
for a skin condition.  (R. 478).  Plaintiff's mother administers
his medications on a daily basis because plaintiff gets his
medications "mixed up."  (R. 472-73, 478).

Following his graduation from high school in June 2002,
plaintiff was hired to work in a summer program which provided
free lunches to children.  (R. 453-54).  From the end of August
2002 through the end of the school year in June 2003, plaintiff
worked in the cafeteria of an elementary school, washing dishes
and supervising children in an after-school supper program.   In
this job, plaintiff worked Monday through Friday from 9:30 a.m.
to 4:00 p.m., and he was paid $5.15 per hour through the North
Central Pennsylvania Regional Planning & Development Commission,
which is a governmentally funded program for persons with special
needs.[6]  Plaintiff experienced no difficulties learning or
performing this job, and he never missed an entire day of work.[7]
(R. 451-52, 454-55, 470, 472).

---

[6]During the first hearing, plaintiff's mother testified that
employment through a program sponsored by the North Central
Pennsylvania Regional Planning & Development Commission is not
considered "competitive employment."  (R. 481).

[7]Plaintiff testified, and his mother corroborated, that he
had difficulty getting up for work in the morning, requiring his
parents' assistance.  (R. 473, 479).

6

When the job in the elementary school cafeteria ended,
plaintiff applied for a job at the St. Elizabeth's Mother House
and he was hired to perform maintenance work.[8]  (R. 452, 474-75,
491).  Eventually, plaintiff's hours were cut by the St.
Elizabeth's Mother House due to funding cutbacks in the
government program through which he was being paid.  As a result,
plaintiff took a temporary job with GKN Center Metals, which he
obtained through an employment agency.  In this job, plaintiff
worked in quality control, checking for defects in pistons
manufactured for General Motors engines.  After three days,
plaintiff (as well as his entire crew which was comprised of
temporary employees) was laid off.[9]  At the time of the second
hearing in October 2004, plaintiff was attempting to obtain
employment through two employment agencies.  (R. 491-93, 509).

Plaintiff has had a driver's license since he was 17 years
old, and he drives on a regular basis.  Plaintiff, who owns his
own car, is responsible for his automobile insurance premiums and
for his gasoline expense. (R. 455, 469, 499).  Occasionally,
plaintiff's sister asks him to provide transportation for one of
his nephews.  Plaintiff socializes with friends on a weekly

---

[8]At the time, plaintiff's mother worked at the St.
Elizabeth's Mother House.  (R. 480).

[9]Plaintiff worked for GKN Center Metals for a total of 20
hours over the course of the three days.  (R. 494).

7

basis, going out to eat, to movies or to high school football games.  (R. 464-65, 496).

Plaintiff, who lives with his parents, tends to be "pretty busy" around the house, vacuuming the carpets, folding laundry and taking care of his bedroom.  He also performs household chores for an aunt who lives nearby.  (R. 465, 472, 494-95). Plaintiff can prepare simple meals for himself, and he has no problems counting money.[10]  (R. 466, 476, 479, 495, 502). Plaintiff has always had a problem with concentration.[11]  (R. 504).

## C. Evidence in the Record

The administrative record in this case contains the following evidence:

### 1.  Testing Results - 10/1/97

On October 1, 1997, when plaintiff was 13 years old, he was referred for evaluation based on his classification as "emotionally disturbed."  At the time, plaintiff was in the

---

[10]With respect to personal hygiene, plaintiff is able to take care of himself.  In fact, plaintiff's mother testified that he is "very good" with respect to his personal hygiene.  (R. 479, 495).

[11]With respect to the impact of this problem on working, plaintiff testified that he had difficulty concentrating on verbal instructions from his boss, *i.e.*, he would forget the second or third item in a list of things he was instructed to do. He further testified, however, that he is able to follow multiple instructions if they are in writing.  (R. 505-06).

8

eighth grade, and he was receiving various support services in school.[12]  The Wechsler Intelligence Scale for Children - Revised was administered to plaintiff, indicating a Full Scale IQ of 93.[13]  (R. 132-34).

## 2.  Records of Thomas C. Stephens, CSW-R - 1/6/94 to 5/24/99

Plaintiff saw Thomas C. Stephens, a mental health therapist, for individual therapy sessions on a regular basis between January 6, 1994 and May 24, 1999 (when his family moved to Pennsylvania from New York), in connection with his obsessive/compulsive behavior.  (R. 301-02, 304-07, 310, 312-14, 316, 319-23, 325-26, 328-29, 331, 336-40).

## 3.  Records of Steven J. Sonnenberg, M.D. - 7/18/94 to 6/1/99

Dr. Steven J. Sonnenberg, a psychiatrist, initially evaluated plaintiff on July 18, 1994 at the recommendation of a school psychologist who believed that plaintiff's obsessive thinking was interfering with his school performance as well as his interpersonal abilities.  Dr. Sonnenberg agreed that

---

[12]Plaintiff also received testing modifications in school, *i.e.*, questions were read to him, he was permitted to use a calculator with fractional capacity, he was given tests in an alternative location and he was given additional time to complete tests.  (R. 132).

[13]The evaluator indicated that plaintiff was within the "average to low average range" in reading, written language and knowledge, and that he was "well below the average range" in mathematics.  (R. 133).

9

plaintiff's obsessive/compulsive behavior was impairing his
functioning, and he suggested a trial of Prozac, an anti-
obsessive agent. (R. 308-09). Thereafter, until plaintiff's
family moved from New York to Pennsylvania in the summer of 1999,
Dr. Sonnenberg saw plaintiff every 2 to 3 months for medication
checks, sometimes increasing his dosage of Prozac and sometimes
decreasing it. The notes of these office visits indicate, for
the most part, that plaintiff was doing well and that his
compulsive behavior was under control. (R. 311, 314, 317-18,
324, 327, 330, 332-35).

### 4. Report of Consultative Psychological Evaluation - 9/17/99

On September 17, 1999, shortly before his 16th birthday,
plaintiff underwent a consultative psychological evaluation by
Roberta Rigsby, Ph.D., at the request of the New York State
Office of Temporary and Disability Assistance.[14]  Following an
hour-long interview, Dr. Rigsby prepared a report in which she
made several recommendations, including a recommendation that
plaintiff's therapist and psychiatrist closely monitor him for

---

[14]Apparently, this evaluation was conducted in connection
with an earlier application for childhood DIB filed by plaintiff.
In the ALJ's first decision, he states that, in 1999, plaintiff
filed an application for childhood DIB, which was denied
initially based on a determination that plaintiff was not
disabled; that plaintiff did not appeal the denial; and that he
could find no good cause for reopening that application. (R.
35).

symptoms of psychotic disorder based on her observations during the interview.[15] Dr. Rigsby indicated in her report that plaintiff's prognosis at that point appeared to be "poor." (R. 274-79).

**5. Records of Hridayesh D. Pathak, M.D. - 8/21/99 to 8/10/01**

Upon moving to Pennsylvania with his family, plaintiff was evaluated at The Guidance Center by Dr. Hridayesh D. Pathak, a

---

[15]In this connection, Dr. Rigsby's reports states:

... The claimant spoke spontaneously and technically his speech was coherent and there were no loosening of associations. However, odd qualities of his speech must be noted here. His voice had a distinctly mechanical quality and he made frequent pauses with a clicking noise. His voice resembled that of autistic children whom I have evaluated, and it appeared to be modeled after the voices of cartoon characters on TV. The claimant also stuttered frequently. His style of speech was extremely pedantic and round-about and he often gave overly detailed answers. It also should be noted that he often made whispering sounds to himself when I was not looking directly at him but rather was doing some writing during the interview. The claimant denied any hallucinations; however, in light of the preceding information his denial should be taken with a grain of salt.... He does not appear to be of more than average intelligence. Due to the vague and confused manner in which the claimant presented, he was not given any test of memory in this interview. His casual performance in response to questions that were asked indicate that his memory is not particularly good. The claimant's judgement appears to be unreliable, being strongly influenced by his compulsions and obsessions and possibly by some thought disorder. The claimant's attention span was noticeably shorter than the norm for his age and he appeared to be quite distractible....

(R. 277-78).

11

psychiatrist, on August 21, 1999, for continued mental health
services.  In his report of the evaluation, Dr. Pathak stated,
among other things, that plaintiff was likeable and comfortable
in the interview; that plaintiff had good eye contact and did not
appear to be overly anxious; that plaintiff was fully oriented to
time, place and person; that plaintiff denied being depressed;
that plaintiff exhibited reasonably good insight into his
problems and need for treatment; that, by estimation, plaintiff's
intellectual functioning was about average; and that plaintiff
was able to take care of his personal needs.  Dr. Pathak
indicated that plaintiff's range on the Global Assessment of
Functioning ("GAF") Scale at that time was 51-60.[16]  (R. 349-51).
Thereafter, plaintiff continued to see Dr. Pathak on a periodic
basis for medication checks until August 2001.  (R. 341-
48).

---

[16]The GAF Scale considers psychological, social and
occupational functioning on a hypothetical continuum of mental
health - illness.  The highest possible score is 100 and the
lowest is 1.  A GAF range between 51 and 60 denotes moderate
symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupational or
school functioning (e.g., few friends, conflicts with peers or
co-workers).  Diagnostic and Statistical Manual of Mental
Disorders (DSM IV), at 30-32.

12

**6.   Intake Evaluation by James E. Kronlage, ACSW, LSW -**
**5/3/01**

In the spring of 2001, Dr. Pathak referred plaintiff to
James E. Kronlage, a therapist, for counseling due to fantasies
about revenge.  During Mr. Kronlage's initial evaluation of
plaintiff on May 3, 2001, plaintiff reported that he had been
fired from a job and had fantasies about going into his former
place of employment, holding it up and making everyone strip.[17]
Plaintiff also reported that he had been having fantasies of
taking revenge on a schoolmate who grabbed his breasts and pulled
his hair back in the school hallway by shooting out the windows
of the boy's car.  After speaking with plaintiff, Mr. Kronlage
concluded that plaintiff did not appear to be in danger of
carrying out his fantasies of revenge, and he recommended
individual therapy for plaintiff to help him handle his anger
more effectively and decrease his revengeful fantasies.  Mr.
Kronlage assessed plaintiff's GAF score at that time as 50 and

---

[17]This fantasy of revenge related to plaintiff's employment
by Tim Horton's Restaurant during high school.  According to Mrs.
Smith, plaintiff's mother, plaintiff was fired from this job
after a couple of days because he could not keep up with the pace
of the work and, subsequently, he "talked about doing bad stuff
to them for months and months."  (R. 484).

13

his highest GAF score in the preceding year as 65.[18]   (R. 377-78).

### 7.   IEP Team Report - 6/15/01

On June 15, 2001, the IEP Team met to discuss a program for plaintiff for his upcoming senior year of high school.   With respect to his level of educational performance at the time, the report of the IEP Team meeting indicates that plaintiff's progress in English and History were "satisfactory," and that his current grades were as follows: "Social Studies - 87; Advanced Office Practice - 81; Senior Choir - 87; Physical Education - 75; Health - 86; English - 92."   With respect to the effect of plaintiff's disability on his progress in the general education curriculum, the report indicates that plaintiff had "difficulty keeping up with the pace of instruction typically found in regular education classes," but that "with the combined effort of special/regular education teachers, administrators, James and his parents, he has been able to be integrated for nearly all general education classes."   (R. 209-21).

---

[18]A GAF score of 50 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job), while a GAF score of 65 denotes some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   Diagnostic and Statistical Manual of Mental Disorders (DSM IV), at 30-32.

14

## 8. Teacher/Counselor Questionnaire - 8/31/01

On August 31, 2001, Amy Metcalf and Mary Beth Glover
completed a Teacher/Counselor Questionnaire on plaintiff's behalf
at the request of the Pennsylvania Bureau of Disability
Determination. In summary, the questionnaire indicates that
plaintiff's school placement was in the "Resource Room;" that
plaintiff received special education services 13% of the day;
that plaintiff was mainstreamed for some classes; that plaintiff
was not a behavioral problem; that plaintiff did "pretty well" if
instructions were discussed with him individually; that plaintiff
needed extra time to organize his thoughts; that plaintiff
usually completed his assignments "quite well;" that plaintiff
related to them "very well;" that plaintiff related to other
children; and that plaintiff was not anxious, withdrawn or
aggressive. (R. 223-26).

## 9. Records of Terje Fokstuen, M.D. - 11/12/01 to 2/5/02

Plaintiff was examined by Dr. Terje Fokstuen, a
psychiatrist, at The Guidance Center on November 12, 2001.[19]   In
his notes of the examination, Dr. Fokstuen indicated that
plaintiff was "doing rather well academically in all subjects
except Sociology;" that plaintiff reported having "lots of
difficulties staying on task;" and that plaintiff reported his

---

[19]Dr. Fokstuen took over plaintiff's care at The Guidance
Center from Dr. Pathak.

15

"mind frequently wanders off," although it happens "much less" when plaintiff is doing something he really loves to do.  Dr. Fokstuen recommended that plaintiff continue in individual counseling with Mr. Kronlage, his therapist, on a bi-weekly basis and that plaintiff continue his then current medications (Prozac and Risperdal), which did not cause any side effects.  (R. 403).

On December 17, 2001, plaintiff's therapist reported to Dr. Fokstuen that plaintiff had been experiencing "a lot of crying spells;" that plaintiff's anxiety level had escalated; that plaintiff was having difficulty focusing and felt guilty; and that plaintiff was obsessing "a lot."  As a result, Dr. Fokstuen contacted plaintiff's mother and made some changes in his medications.  In a follow-up telephone call to Dr. Fokstuen on December 26, 2001, plaintiff's mother reported that he was not crying as much and that he was not as depressed as he had been.  (R. 404).

Dr. Fokstuen saw plaintiff for a follow-up visit on January 28, 2002.  At that time, plaintiff's mental status examination was unremarkable, and he was given new prescriptions for his medications.[20]  (R. 405).  On February 5, 2002, plaintiff's mother called Dr. Fokstuen to report that plaintiff was "not

---

[20]On January 29, 2002, Dr. Fokstuen completed a form in connection with plaintiff's capacity to work in which he indicated that plaintiff was temporarily incapacitated until July 31, 2002.  (R. 401).

16

doing well at all."  He had been crying a lot and stated that he felt hopeless and helpless.  In response, Dr. Fokstuen adjusted plaintiff's medications.  (R. 406).

**10.  Report of Evaluation by David D. Harten, M.A. - 12/5/01**

On December 5, 2001, David D. Harten, M.A., a licensed psychologist, evaluated plaintiff based on a referral by the Office of Vocational Rehabilitation.  The object of the testing was to determine whether plaintiff had a learning disability for purposes of vocational planning.  The testing showed a Full Scale IQ of 89, placing plaintiff in the low average range of intellectual abilities.  Mr. Harten, who did not detect any significant learning disabilities, noted that most of plaintiff's lower subtest scores were due to difficulties in concentration and attention.  Mr. Harten opined that plaintiff's "primary functional limitations towards competitive employment would be his psychiatric problems," ... "especially when it comes to concentration and attention."  (R. 379-82).

**11.  Report of James E. Kronlage, ACSW, LSW - 2/18/02**

On February 18, 2002, at the request of plaintiff's counsel, Mr. Kronlage prepared a report in connection with the individual therapy he had been providing to plaintiff.  Mr. Kronlage indicated that he had seen plaintiff for a total of 16 sessions following plaintiff's referral to him in May 2001 for violent fantasies of retaliation against an ex-employer who had fired him

17

and a peer who picked on him. After describing his impressions

of plaintiff based on their therapy sessions, Mr. Kronlage stated

the following with respect to plaintiff's employability:

> "It is my opinion that James' frequent and intense
> obsessions, sporadic bouts of overwhelming intense anxiety,
> his low frustration tolerance levels, daydreaming and
> difficulty sustaining his concentration all would severely
> hinder him from maintaining any meaningful employment on an
> ongoing basis. All of these factors appear to impact his
> school performance negatively and require him to have a lot
> of individual attention. I believe what has hindered him
> from performing consistently at school will also hinder him
> from performing his job duties in a competent fashion
> consistently enough at work."

(R. 371-73).

## 12. Vocational Report - 6/11/2003

In a letter to plaintiff's counsel dated June 11, 2003, Ron

S. Berguson, a vocational rehabilitation counselor, indicated

that, in June 2002, plaintiff underwent a Community Based Work

Assessment through Goodworks to determine his employability,

which showed the following: (a) plaintiff has difficulty with

attention to task; (b) plaintiff needs a high level of

supervision; (c) plaintiff works at a slow speed; and (d) there

were concerns about plaintiff talking to himself.[21] Mr. Berguson

further indicated that based on the assessments of plaintiff and

---

[21]During her testimony at the first hearing before the ALJ in
June 2003, plaintiff's mother corroborated Mr. Berguson's
statement regarding plaintiff's tendency to talk to himself.
Specifically, Mrs. Smith testified that plaintiff "sits and he
talks to himself continually." (R. 482).

18

his involvement in working with plaintiff, plaintiff would need the assistance of a job coach "for him to try to work on a part time basis."   (R. 250-52).

### 13.   Letter of Terje Fokstuen, M.D. - 6/16/03

In a June 16, 2003 letter to plaintiff's counsel regarding plaintiff's employability, Dr. Fokstuen indicated he did not have enough information to state with certainty that plaintiff is totally disabled from working.   Dr. Fokstuen did note, however, that plaintiff's diagnoses (Pervasive Developmental Disorder and Obsessive Compulsive Disorder in partial remission) "could represent a severe handicap as far as ability to adjust and cope with changes that could make him unable to work in a competitive employment market with the exception of a small niche in which he may perform well."   (R. 375-76).

### 14.   Report of North Central Pennsylvania Regional Planning & Development Commission - 9/2/03

On September 2, 2003, the ALJ requested information from the North Central Pennsylvania Regional Planning & Development Commission concerning plaintiff's employment through that organization.   The response indicates that plaintiff was involved in a Work Experience Program; that plaintiff was given special considerations on the job; that plaintiff was working at a convent helping the nuns plant flowers; and that, although the nuns were willing to keep plaintiff in their employ through this

type of training program, they would not consider putting
plaintiff on their payroll.[22]  (R. 259-60).

### 15.  Report of John W. Addis, Ph.D. - 1/19/04

On January 19, 2004, at the request of plaintiff's counsel,
John W. Addis, Ph.D., conducted a psychological evaluation of
plaintiff.  At the time, plaintiff was 20 years old.  With
respect to capabilities for purposes of Social Security
disability benefits, Dr. Addis opined that plaintiff's abilities
to sustain attention, follow instructions, relate to others and
tolerate pressures are marginal to poor; that plaintiff does not
have difficulties in performing daily activities in his home
setting on a sustained basis; that plaintiff demonstrates
difficulties in his ability to get along with others, and
interact and communicate with family, friends, neighbors,
coworkers, employers and the general public; that, with regard to
concentration, persistence or pace, plaintiff would conceivably
have difficulties completing assignments and sustaining work or
work-like related activities; and that plaintiff's prognosis was
"static."  (R. 421-35).

---

[22]This latter statement was corroborated by plaintiff's
mother during her testimony at the first hearing before the ALJ
in June 2003.  Specifically, Mrs. Smith, who also was employed by
St. Elizabeth's Mother House, testified that "[t]he Mother House
would not hire [plaintiff] unless [he was] paid through this
other program."  (R. 480).

20

### III. Legal Analysis

#### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating Section 405(g)), which
provide that an individual may obtain judicial review of any
final decision of the Commissioner by bringing a civil action in
the district court of the United States for the judicial district
in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance.  Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence.  Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

#### B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure

21

an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

* * *

> In <u>Plummer</u>, we recounted the five step sequential
> evaluation for determining whether a claimant is under a
> disability, as set forth in 20 C.F.R. § 404.1520:
>
>> In step one, the Commissioner must determine
>> whether the claimant is currently engaging in
>> substantial gainful activity.  20 C.F.R. § 404.1520(a).
>> If a claimant is found to be engaged in substantial
>> gainful activity, the disability claim will be denied.
>> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287,
>> 2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
>> Commissioner must determine whether the claimant is
>> suffering from a severe impairment.  20 C.F.R.
>> § 404.1520(c).  If the claimant fails to show that her
>> impairments are "severe," she is ineligible for
>> disability benefits.
>>
>> In step three, the Commissioner compares the
>> medical evidence of the claimant's impairment to a list
>> of impairments presumed severe enough to preclude any
>> gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
>> does not suffer from a listed impairment or its
>> equivalent, the analysis proceeds to steps four and
>> five.  Step four requires the ALJ to consider whether
>> the claimant retains the residual functional capacity
>> to perform her past relevant work.  20 C.F.R.
>> § 404.1520(d).  The claimant bears the burden of
>> demonstrating an inability to return to her past
>> relevant work.  <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d
>> Cir.1994).
>>
>> If the claimant is unable to resume her former
>> occupation, the evaluation moves to the final step.  At
>> this stage, the burden of production shifts to the
>> Commissioner, who must demonstrate the claimant is
>> capable of performing other available work in order to
>> deny a claim of disability.  20 C.F.R. § 404.1520(f).
>> The ALJ must show there are other jobs existing in
>> significant numbers in the national economy which the
>> claimant can perform, consistent with her medical
>> impairments, age, education, past work experience, and

22

> residual functional capacity.  The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

\*    \*    \*

220 F.3d at 118-19.

With respect to the ALJ's application of the five-step
sequential evaluation process in the present case, steps one and
two were resolved in plaintiff's favor: that is, based on the
record, the ALJ found that plaintiff had not engaged in
substantial gainful activity since his alleged onset dates, and
that plaintiff suffers from a severe mental impairment.  (R. 18).
Turning to step three, the ALJ found that plaintiff's mental
impairment was not sufficiently severe to meet or equal the
requirements of any Listing in Part 404, Subpart P, Appendix 1 of
the Social Security Regulations, relating to mental impairments.
(R. 18-19).  As to step four, the ALJ found that plaintiff has no
vocationally relevant past work experience.  (R. 21).  Thus, the
ALJ was required to address step five.  At step five, the ALJ
found that plaintiff was capable of making a successful
adjustment to work which exists in significant numbers in the
national economy, and that, therefore, plaintiff was not
disabled.  (R. 21-22).

**C. Plaintiff's Arguments in Support of Summary Judgment**

Plaintiff raises three arguments in support of his motion for summary judgment. First, plaintiff asserts that the ALJ erred at step three of the sequential evaluation process by failing to find that he meets a listed mental impairment. Second, plaintiff asserts that the ALJ's assessment of his RFC was erroneous. Third, plaintiff asserts that, if the Court does not agree with either of his first two arguments, a remand is appropriate because new evidence, which was not previously available, should be considered.

i

Turning to plaintiff's first argument, in order for a claimant's impairment to meet a listed impairment, "it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severe, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in original). Plaintiff asserts that the ALJ erred by failing to find that he meets Listing 12.06, relating to Anxiety-Related Disorders, which provides:

> 12.06 *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

24

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.   Medically documented findings of at least one of the following:

1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.   Motion tension; or
b.   Autonomic hyperactivity; or
c.   Apprehensive expectation; or
d.   Vigilance and scanning;

or

2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.   Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.   Resulting in at least two of the following:

1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

OR

25

C.   Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.06.

Contrary to plaintiff's contention that he meets Requirements A and B of Listing 12.06 (Document No. 18, p. 2), the Court concludes that substantial evidence supports the ALJ's determination that plaintiff did not meet any of the listed impairments for mental disorders, including Listing 12.06.

With respect to subsection 4 of Requirement A of Listing 12.06, *i.e.*, that plaintiff's obsessions or compulsions be a source of marked distress,[23] there is substantial evidence to support the ALJ's failure to find that plaintiff's obsessive compulsive disorder is a source of marked distress for plaintiff. The ALJ noted in his decision that plaintiff has never received inpatient mental health treatment; that plaintiff was able to function well in school; and that Dr. Fokstuen, one of plaintiff's treating psychiatrists, indicated that plaintiff's obsessive compulsive disorder was in remission.  (R. 19).  In addition, plaintiff's own testimony at both hearings before the ALJ established that his obsessive compulsive disorder has been

---

[23]This is the subsection of Requirement A of Listing 12.06 on which plaintiff relies to support his argument that he meets this listed mental impairment.

well controlled with medication for years.  (R. 458-60, 463,
498).

There also is substantial evidence to support the ALJ's
determination that plaintiff does not meet Requirement B of
Listing 12.06, which requires a claimant to meet at least two of
the four enumerated limitations.  With respect to activities of
daily living (subsection 1), the ALJ noted that plaintiff is only
mildly limited by his mental impairment.  He regularly performs
household chores, and he can cook "somewhat," take care of his
personal needs, drive a car, read, use cash and a debit card and
maintain a checking account.  As to social functioning
(subsection 2), the ALJ noted that plaintiff socializes with
friends on a weekly basis, engaging in activities such as going
to high school football games.  Finally, regarding repeated
episodes of decompensation, each of extended duration (subsection
4), the ALJ noted the lack of evidence of any such episodes.[24]
(R. 20-21).

In sum, as noted by the Commissioner (Document No. 21, p.
10), in determining whether a claimant meets a listed impairment,
the ALJ is not required to use particular language or adhere to a

---

[24]The ALJ's conclusion regarding the fourth limitation
enumerated in Requirement B of Listing 12.06, *i.e.*, marked
difficulties in maintaining concentration, persistence or pace
(subsection 3), will be addressed in the next section of this
Memorandum Opinion.

27

particular format in conducting his analysis.  Rather, the ALJ's
task is to sufficiently develop the record and explain his
findings to permit meaningful review.  See Jones v. Barnhart, 364
F.3d 501, 504-05 (3d Cir.2004).  In the present case, the ALJ
complied with these requirements, and, therefore, plaintiff's
first argument is unavailing.

ii

Regarding plaintiff's second argument, plaintiff contends
that the ALJ's assessment of his RFC is erroneous because he "is
severely limited in his ability to perform work-related tasks,"
noting the vocational evidence in the record regarding his need
for special assistance and inability to be left unattended at
work, as well as the report of Dr. Addis.  (Document No. 18, pp.
2-3).  In response, the Commissioner asserts that the ALJ's
assessment of plaintiff's RFC was "completely consistent with
[plaintiff's] testimony."

After consideration, the Court concludes that the ALJ's
assessment of plaintiff's RFC, which was the basis for the VE's
testimony that plaintiff could perform substantial gainful
activity existing in significant numbers in the national economy,
including the jobs of cleaner, cafeteria attendant and laundry
worker, is not supported by substantial evidence and was not,
contrary to the Commissioner's assertion, entirely consistent
with plaintiff's testimony at the hearings.

Specifically, substantial evidence does not support the ALJ's determination that plaintiff is only mildly limited with respect to concentration, persistence or pace and has the ability to maintain concentration and attention for extended periods.[25] In fact, the record contains overwhelming evidence establishing that plaintiff is markedly limited in these respects, including the following evidence:

(1) Plaintiff testified that he has always had a problem with concentration (R. 504);

(2) Plaintiff's mother testified that he is unable to take his medications without her assistance because "... he might take the morning medicine at night or he doesn't take it at all...." (R. 478);

(3) While he was in school, plaintiff received support services due to his mental impairment, including testing modifications such as having questions read to him and being given additional time in which to complete tests (R. 132);

---

[25]In its entirety, the ALJ concluded that plaintiff retained the RFC to perform the physical requirements of work at all exertional levels; that plaintiff is only mildly limited in his activities of daily living, social functioning and concentration, persistence and pace; that plaintiff has never had an episode of decompensation; that plaintiff can occasionally interact with the public; that plaintiff can maintain concentration and attention for extended periods; and that, although he cannot perform complex and detailed tasks, plaintiff is able to perform multiple tasks if they are in writing.  (R. 21).

29

(4) After conducting a psychological evaluation of plaintiff at the request of the New York State Office of Temporary and Disability Assistance in September 1999, Dr. Roberta Rigsby noted in her report that plaintiff's "... attention span was noticeably shorter than the norm for his age and he appeared to be quite distractible...." (R. 278);

(5) The June 2001 report of the IEP team, which met to discuss an individualized program for plaintiff's senior year of high school, noted, among other things, that plaintiff had "difficulty keeping up with the pace of instruction typically found in regular education classes" (R. 213);

(6) The Teacher/Counselor questionnaire completed by Amy Metcalf and Mary Beth Glover in August 2001 at the request of the Pennsylvania Bureau of Disability Determination noted that (a) plaintiff did "pretty well" if instructions were discussed with him individually and (b) plaintiff needed extra time to organize his thoughts (R. 224);

(7) The records of Dr. Fokstuen, one of plaintiff's treating psychiatrists, dated November 12, 2001, noted that plaintiff reported having "... a lot of difficulties staying on task and that his mind frequently wanders...." (R. 403);

(8) David A. Harten, M.A., a licensed psychologist who evaluated plaintiff based on a referral by the Office of Vocational Rehabilitation, reported in December 2001 that

plaintiff's "primary functional limitations towards competitive employment would be his psychiatric problems, ... especially when it comes to concentration and attention" (R. 382);

(9) James W. Kronlage, the therapist who began counseling plaintiff in May 2001 for violent fantasies of revenge against, among others, an ex-employer who had fired plaintiff because he was unable to keep up with the pace of the work, opined that plaintiff's "... frequent and intense obsessions, sporadic bouts of overwhelming intense anxiety, [] low frustration tolerance levels, daydreaming and difficulty sustaining [] concentration all would severely hinder him from maintaining any meaningful employment on an ongoing basis...." (R. 373);

(10) Ron S. Berguson, a vocational rehabilitation counselor who has worked with plaintiff, opined in June 2003, that plaintiff would require the assistance of a job coach even to work on a part-time basis due to his difficulties with attention to task, need for a high level of supervision and inability to work at more than a slow speed (R. 250-52);

(11) A September 2003 report from the North Central Pennsylvania Regional Planning & Development Commission through which plaintiff had been employed by the St. Elizabeth's Mother House indicates that plaintiff was given "special considerations" on the job and that, although the nuns were willing to keep plaintiff in their employ through this type of training program,

31

they would not have considered putting him on their payroll; (R. 259-60); and

(12) The January, 2004 report of John W. Addis, Ph.D., who conducted a psychological evaluation of plaintiff at the request of his counsel, indicates that plaintiff's "... ability to stay on task is unlikely due to the ruminations that he experiences, usurping fantasies and his tendency to simply get off track...." (R. 433).

As noted previously, since plaintiff has no vocationally relevant past work experience, the burden shifted to the Commissioner to demonstrate that plaintiff is capable of performing jobs existing in significant numbers in the national economy consistent with, among other things, his RFC. To meet this burden, the ALJ elicited testimony from a VE. However, because the hypothetical question posed by the ALJ to the VE was based on an erroneous assessment of plaintiff's RFC, the VE's testimony does not provide substantial evidence supporting the ALJ's determination that plaintiff is not disabled.

Under the circumstances, plaintiff's motion for summary judgment will be granted, the Commissioner's cross-motion for

32

summary judgment will be denied, and an appropriate order shall issue.[26]

William L. Standish

William L. Standish
United States District Judge

Date: September 28, 2006

---

[26]In light of the Court's conclusion that plaintiff is entitled to judgment as a matter of law based on his second argument in support of summary judgment, it is not necessary for the Court to consider his third argument regarding a remand for consideration of alleged new evidence.

33